**STATE of Missouri, Respondent,**

v.

**Cecil SMITH, Appellant.**

**No. 55275.**

Supreme Court of Missouri, Division No. 2.

March 8, 1971.

Motion for Rehearing or to Transfer to Court En Banc Denied April 12, 1971.

John C. Danforth, Atty. Gen., James M. Reed, Asst. Atty. Gen., Jefferson City, for respondent.

Daniel P. Reardon, Jr., St. Louis, for appellant.

PRITCHARD, Commissioner.

A jury found appellant guilty of the crime of robbery in the first degree by means of a dangerous and deadly weapon but was unable to assess the punishment. The court sentenced appellant to seven

years imprisonment in the Department of Corrections.

Two points are made on this appeal. The first is that the court erroneously and unconstitutionally permitted the state to elicit evidence concerning the identification of appellant by the victim both in court during trial and during the investigative phase of the case. The second is that the court erred in permitting the prosecution to systematically and unconstitutionally exclude all Negroes from the jury panel through prejudicial and unconstitutional use of the peremptory challenge.

At the outset of the trial appellant's motion to suppress evidence of identification was heard outside the jury's hearing. The testimony of service station attendant Leo J. Diehl, Sr., was then taken. On June 13, 1969, he was on duty at 5728 West Florissant in St. Louis, Missouri, at a Clark service station. At 1:30 a. m. Leo was held up by three individuals who were in a blue Oldsmobile. A police officer pulled in the service station as the three were leaving and Leo gave him a description of what had occurred. The officer pursued the three and about 1:45 a. m. they were returned in the custody of the police in a paddy wagon to the service station. Along with the first officer were several other police officers with the paddy wagon. The first officer asked Leo if he could identify the three subjects and he answered that he could. He had no conversation with the officer who merely asked him if these three suspects held him up. The back doors of the paddy wagon were opened and Leo looked in and was able to "tell right there." At approximately 2:00 a. m. Leo saw the three men, all Negroes, at the Sixth District police station and he was asked if he recognized them. The three men were in just the ordinary light, were not in a lineup, and Leo told the police that they were the three people who had been at the service station at 1:35 a. m. The court overruled the motion saying, "[W]hether the jury wants to believe that he made a proper identification, that is up to the jury, but as far as the legal end of it is concerned, I find that he makes it, makes these identifications without any help from the police department from the evidence I've heard."

Before the jury Leo testified that the lighting conditions of the Clark service station were very good, it was "real bright." He was alone there at 1:35 a. m. on June 13. No cash register was provided at the station, but receipts were written down on a checkout sheet. Money taken in was kept in his shirt pocket, and he had $50.00 petty cash to start out with. Money above the $50.00 was dropped at intervals into the safe in the office. That morning Leo saw a car pull up to a pump with its lights on, and as he came out of the station he noticed that the car, a blue Oldsmobile, did not have license plates. There were three people in the car, the passenger side being closest to the station. Leo pointed out in court the man (appellant) who was seated on the passenger side of the car as he approached it. Leo also identified a jacket appellant was wearing. Leo asked the driver of the car if he could help him and he said, "Give me a dollar's worth of gas." Leo put in the gas and was given a five dollar bill for which he returned four singles. At that time appellant, sitting on the right-hand passenger side, pulled a gun on Leo and said, "Okay, this is it. Hand the money over." Leo handed the money from his shirt pocket to the driver and then the police car pulled in facing the Oldsmobile and between it and the pump. The driver asked appellant, "What do we do now?" Appellant answered, "Just play it cool," and they started speeding away and the driver opened the door and dropped the money. The police officer asked what happened and Leo said, "He just got my money," so the officer pursued the car. In about ten minutes the paddy wagon and police car came, and when they opened the door of the paddy wagon Leo recognized appellant and the other two men as the men who robbed him. Leo recovered all the money except $5.00.

On cross-examination Leo testified it took him ten seconds to walk to the car, and as he was making change and was asked for his money he "witnessed a weapon" about five seconds when about 6 feet from the passenger's side of the car. Appellant, wearing a mustache, appeared the same as he did in court, and Leo got to look at him about four seconds. It was not dark in the paddy wagon when Leo looked in because the station lights were on.

William Berger was the police officer who gave chase to appellant and his companions. He pointed appellant out in court as being one of the men sitting in the blue Oldsmobile as he pulled in the station. Berger lost the vehicle he was pursuing and so informed the dispatcher by radio, and a description was put out. He then heard over the radio that the car had been stopped about eight blocks from the service station. When Berger arrived at the arrest scene about seven officers were there. Appellant was one of the men in custody. The three men were brought back to the service station where Leo identified them.

Officer E. David Ostenfeld after hearing Berger call out the pursuit of the blue car (a Pontiac, he said) and describing the occupants as three Negro males, the driver wearing a red shirt and the rear seat passenger a white hat, saw the car coming out of an alley with its lights off. He saw the occupants, swung in front of the car, got out of his car with a gun and told them to get out, which they did. Ostenfeld searched the car and found a five dollar bill, and also found a .45 calibre revolver in the gutter near the vehicle. There were four live rounds in the cylinder, and one was used in test-firing the gun. Ostenfeld pointed out appellant in court as being the man sitting on the passenger side of the vehicle when he stopped it.

■ Appellant suggests that State v. Hamblin, Mo., 448 S.W.2d 603, and State v. Walters, Mo., 457 S.W.2d 817, holding that United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149; Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178; and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (upon which he relies for Point I) apply only to post-indictment situations, should not be so strictly interpreted. However, the holdings of the Walters and Hamblin cases need not be applied here. This is a situation where the identification of appellant by witness Diehl was made within *ten minutes* after the robbery, in an on-the-scene confrontation. In Bates v. United States, 132 U.S.App.D.C. 36, 405 F.2d 1104, there was an identification made of defendant who was exhibited alone and in a patrol wagon to victims of an assault by him within thirty minutes after the attack. The court said, 405 F.2d 1106, "There is no prohibition against a viewing of a suspect alone in what is called a 'one-man' showup when this occurs near the time of the alleged criminal act; such a course does not tend to bring about misidentification but rather tends under some circumstances to insure accuracy. * * * there was no 'substantial likelihood of irreparable *misidentification.*' To the contrary, the police action in returning the suspect to the vicinity of the crime for immediate identification in circumstances such as these fosters the desirable objectives of fresh, accurate identification which in some instances may lead to the immediate release of an innocent suspect and at the same time enable the police to resume the search for the fleeing culprit while the trail is fresh." See also State v. Hamblin, supra, where there was a hospital confrontation of defendant by his victim a short time after the robbery and immediately after defendant's apprehension, held to be permissible; and State v. Bevineau, Mo., 460 S.W.2d 683, where there was a police station observation of defendant by one Fallart whom defendant had tried to force into driving him away, saying that he "had just shot a man and one more wouldn't make any difference to him." The police station observation was about two hours after the robbery. It was held that there was an in-

dependent basis for the in-court identification. Here, there was no impermissible suggestive procedures used by the police in exhibiting appellant to Diehl. Without objection, Officer Berger identified appellant as the man seated on the passenger side of the blue Oldsmobile as it drove away immediately after the perpetration of the robbery. Diehl had sufficient opportunity under good lighting conditions to observe appellant pointing the gun at him. There was no error in permitting the testimony of the at-the-scene confrontation because it may be determined that Diehl's in-court identification of appellant had a basis independent of the confrontations. State v. Williams, Mo., 448 S.W.2d 865; State v. Hamblin, supra. Point I is overruled.

 Citing Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, appellant urges that because the state used thirteen of its fifteen peremptory challenges to exclude Negroes from the jury his right to equal protection of the laws secured by the Fourteenth Amendment to the United States Constitution was violated. The Swain case says (loc.cit. 85 S.Ct. 837, 13 L.Ed.2d 774), "We have decided that it is permissible to insulate from inquiry the removal of Negroes from a particular jury on the assumption that the prosecutor is acting on acceptable considerations related to the case he is trying, the particular defendant involved and the particular crime charged. But when the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on added significance." In that case, however, the record did not reveal "with any acceptable degree of clarity" that the prosecutor was responsible for any systematic striking of Negroes in the

selection of petit juries. Such is the case here. All that is contained in the record is counsel's bare assertion that thirteen of fifteen peremptory strikes were used by the state to exclude Negroes. There is no proof in the record (appellant having the burden of proof on the issue, Swain, supra) that in any or all other criminal cases in the City of St. Louis that Negroes were systematically excluded from jury service by acts of the prosecutor. See State v. Huddleston, Mo., 462 S.W.2d 691; and compare State v. Davison, Mo., 457 S.W.2d 674. Point II is overruled.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.