**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Maurice JOHNSON, Defendant-Appellant.**

No. 42928.

Missouri Court of Appeals,
Eastern District,
Division One.

Jan. 5, 1982.

Joseph W. Downey, Public Defender, Mary Elizabeth Dockery, Asst. Public Defender, St. Louis, for defendant-appellant.

John Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, George A. Peach, Circuit Atty., St. Louis, for plaintiff-respondent.

HOUSER, Senior Judge.

Maurice Johnson, tried before a jury, convicted of robbery in the first degree, § 569.020, RSMo 1969, and sentenced to 25 years' imprisonment, has appealed, urging impermissible identification procedures and improper arguments by the prosecutor in summing up the case before the jury.

The State introduced evidence from which the jury could find these facts: At

approximately 11:30 on the morning of May 17, 1979 two black males wearing nylon stocking masks over their faces entered the lobby of Farm & Home Savings & Loan Association, (at the trial and hereinafter referred to as "the bank") located at 5925 West Florissant in the City of St. Louis, and announced a robbery, saying "Freeze. This is a holdup." Both robbers were carrying guns. There were two tellers and one customer in the bank lobby at the time. Shouting obscenities, one of the robbers approached the customer and pressed "something cold" to her back. Then both of the robbers jumped over the counter; went behind each of the tellers' cages, placed a gun to the temple of each of the tellers, and emptied the contents of the cash drawers into a pillow case. One of the tellers was forced into the vault where he was required to turn over cash from a drawer. The robbers marched and shoved the customer and two tellers into a restroom, threatening to shoot them if they came out. Then the robbers fled the premises, carrying their guns and the pillow case, which contained several thousand dollars in paper money and a $25.00 bag of pennies. From beginning to end the robbery took a "few minutes", variously estimated at from two to ten minutes.

At the time the robbers left the bank building Police Officer Moran, driving a marked patrol car eastbound on West Florissant, observed a cream-colored automobile parked in front of the building, with the passenger door open. He also observed two black males exiting the front door of the bank, walking fast, running, one carrying a sawed-off rifle, the other carrying a white bag. He saw them get into the cream-colored vehicle and drive west on West Florissant at a high rate of speed. Officer Moran made a U-turn, turned on the emergency lights, pursued the fleeing car, and advised his dispatcher that he was traveling west on West Florissant in pursuit of two subjects who had just committed a robbery. After traveling one city block on West Florissant the cream-colored auto turned left on Park

Lane (proceeding the wrong way on a one-way street). Due to the oncoming traffic the two subjects abandoned their car about the middle of the first block, and ran between two houses on the west side of the street. Officer Moran stopped the patrol car and pursued them on foot. Having lost sight of the two subjects, Officer Moran gave the dispatcher a description of the men over his walkie-talkie, and returned to the cream-colored automobile, in which he found the white bag containing currency and coins and two weapons, identified at the trial by Officer Moran as the rifle and handgun carried by the two men as they left the bank. The money, returned to the bank and counted, amounted to $4,500. Several months before the robbery "bait money" had been placed in the tellers' cash drawers. The bait money was photographed and a record of the serial numbers of the bills kept. The serial numbers of twenty $5.00 bills found in the white bag corresponded with the serial numbers of the bait money.

When Captain Kleine heard Officer Moran report the robbery on the police radio he and Officers Keegee and Hale immediately drove to the vicinity and made inquiry of bystanders at West Florissant and Holly streets. Captain Kleine's attention having been directed to the four-family flat located at 5976 West Florissant, the building was placed under surveillance. As Officer Hale started to enter the building appellant came out the front door, perspiring hard, his heart "beating heavily" and "very short of breath." Appellant fit the description of one of the persons wanted for the robbery. Officer Hale placed him under arrest and sat him down in the back seat of the police car. A police officer returned to the bank and asked the customer and tellers to "go look at someone," telling them they had apprehended someone; "that they had arrested a suspect." All of this happened within five, ten or fifteen minutes after the robbers left the bank. The three witnesses went with the police officer a couple of blocks down the street to the intersection of

West Florissant and Park Lane to see appellant. Each of the three witnesses immediately and positively identified appellant as one of the robbers. When observed by them appellant was in police custody, handcuffed, and uniformed officers were standing around him.

Appellant's first point:

"The trial judge erred in refusing to suppress the pretrial identifications of witnesses Zelma Winston, Ruth Burks and Kraig Lange and in allowing their in-court identification because the original showup was so impermissibly suggestive as to give rise to substantial likelihood of irreparable misidentification and because the in-court identification did not have an independent basis, in that the showup was conducted while the defendant was handcuffed, next to a police car, flanked by police officers and in other circumstances that were unduly suggestive and in that the witnesses were all influenced by statements made to them prior to the showup by police officers all resulting in a deprivation of due process for the defendant."

■ The refusal of the Court to suppress the pre-trial identifications has not been properly preserved for review because "(n)o objection was made when the witnesses identified defendant at the trial nor when they described the manner of their initial identification." *State v. Ethelbert*, 611 S.W.2d 379, at 381 (Mo.App.1981). The alleged error was not briefed as plain error, but the Court will review the point sua sponte because a federally guaranteed constitutional right of the defendant is involved. *State v. Garrett*, 564 S.W.2d 51, at 52 (Mo.App.1978).

■ Appellant argues that the confrontation between appellant and the three witnesses was impermissively suggestive because the witnesses were under great stress and excitement and did not focus all their attention on the robbers, but were looking at the guns and the other witnesses; that

the robbers were wearing masks which prevented the witnesses from seeing their facial features; that their vision was obstructed by the robbers not facing them at all times; that their opportunity to view the robbers was minimal. Appellant points out discrepancies in the tellers' descriptions of the clothing worn by the smaller of the two robbers, and that the customer could not describe any of the clothing worn by the robbers. Appellant maintains that the statements made by the police officers to the witnesses prior to the show-up were so suggestive that they gave rise to a substantial likelihood of mistaken identification— that their statements suggested that the police believed the man apprehended was a guilty party. Appellant brands the show-up as unduly suggestive because conducted next to a police car with appellant in custody, flanked by police and handcuffed. Appellant contends there is no evidence indicating that a lineup (rather than a show-up) could not have been conducted, arguing that one-on-one show-ups raise serious doubts about the accuracy of human perception and recognition.

There was no impropriety in conducting a show-up instead of a lineup. A show-up was the proper identification procedure under the exigencies of the situation. A robbery had occurred only minutes before. The robbers, fleeing on foot, were in the immediate vicinity. Several police officers were on hand, conducting an intensive neighborhood search. When appellant was arrested, a speedy determination of the question whether he was one of the robbers was imperative. If appellant should be identified the search would continue for the other robber. If absolved by the witnesses, the search for the two robbers could continue while the trail was hot. There was no time to stop and organize a lineup.

The record does not bear out appellant's contention that statements were made to the witnesses suggesting in effect that the police believed the man apprehended was a guilty party. Some intimation, implication

or suggestion that officers suspect a subject presented to witnesses inevitably inheres in every show-up, else why conduct a show-up? The true question is whether the show-up is *impermissively* suggestive. *Simms v. State*, 568 S.W.2d 801, 803 (Mo.App.1978). The organization and conduct of this show-up was free from undue suggestion. In inviting the witnesses to view appellant the police officers did not indicate their belief that appellant was one of the robbers. Witness Lange testified that the police notified them that "they had apprehended someone, and they wanted us to come down and look at him. * * * [T]hey informed us that they had a suspect down the street that they had arrested, and they put us into a car and drove us two blocks down the street;" that up to the time appellant was identified nobody suggested to Lange "that that was a robber or anything like that. * * * [T]hey asked us if that was the man who robbed the savings and loan." Witness Winston, asked what the police said to her, responded "I wasn't told anything. * * * [A] police officer came into the bank and asked us to come * * * go look. at someone * * *." Witness Burks testified that a police officer came by to take the witnesses to view someone; that "[t]hey said they had apprehended someone." She denied that the police said anything to her "about what to do when you got down there or anything like that." Asked whether she picked out appellant as one of the robbers because the police were around him or because he was the man, she answered "because he was the person we had just encountered in the bank, in the savings and loan." These questions and answers are significant:

"Q. Before you went up to see that person did the police tell you that they had caught the person?

A. No.

Q. What did they tell you * * * ?

A. They would like for us to go up to see something.

Q. Did they tell you or give you any indication what you were going to do?

A. We just had an idea.

Q. What was your idea?

A. That, perhaps, we hoped they had caught one or both."

The foregoing evidence provides no basis for the proposition that the witnesses were influenced or the victims of suggestions by reason of statements made to them by police officers prior to the show-up identifications.

■ A show-up is not necessarily tainted by the fact that the suspect is handcuffed, or in or near a police car, or that uniformed police officers are present. In *Simms v. State, supra*, Simms was arrested and returned to the scene of the robbery within ten minutes after the commission of the crime. Simms was displayed to the victim in a one-man show-up, as he sat in the back seat of a police car. He was handcuffed at the time. The situation was nearly identical to the situation in this case. This Court, holding the identification procedure not suggestive, cited *State v. Dodson*, 491 S.W.2d 334 (Mo. banc 1973), in which "(t)he court found no due process violation in a show-up confrontation where the suspect was viewed in handcuffs and sitting in a police car within thirty minutes of the crime." *Simms, supra*, 568 S.W.2d at 803. In *State v. Smith*, 465 S.W.2d 482, 483 (Mo. 1971), a show-up held within ten minutes after a robbery was adjudged not impermissibly suggestive where conducted while the suspects were seated in the back of a paddy wagon.

The trial court properly overruled appellant's motion to suppress evidence of the identification procedure at the show-up.

■ In addition, there was an independent basis for the in-court identifications of appellant. The totality of the circumstances are to be considered in determining the reliability of in-court identification testimony, *State v. Higgins*, 592 S.W.2d 151 (Mo. banc 1971), in which these factors were listed for consideration: the opportunity of

the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

■ All three of the witnesses had ample opportunity to view appellant while the crime was in progress. The lights in the bank were turned on. All three paid close attention to the faces of both robbers. The robbers faced both tellers at their windows, vaulted over the counter and placed guns at the heads of the tellers. Appellant was "right next" to Lange, touching him; "very close." Lange was able to see appellant's face, notwithstanding he wore a nylon mask. Lange testified that at a distance he could not see through the mask, but when the man moved up much closer he could see through it. During the robbery Lange studied appellant's face. On the way to the vault, and while at the safe within the vault, appellant was "face to face" with Lange, directly in front of him "within two feet." The total time of the robbery, in Lange's judgment, was three minutes. Witness Winston saw and paid attention to the faces of both robbers. The masks were sheer-type nylon hosiery. Winston thought the men were in the bank "about five minutes." Appellant came close enough to Winston to touch her. She considered his facial features, testifying he had an oval shaped face with a blunt nose; that one eye was not normal; that his eyes were not coordinated. It appeared "as if one eye had been damaged or in some way he could not focus it as well as the other one." When at trial appellant upon request removed his dark tinted glasses Winston looked at him and testified, "[t]hose are the eyes." Witness Burks testified the men were in her presence five to ten minutes, maybe longer. She watched what the robbers did behind the counter. The nylon stocking distorted her ability to see through "to an extent," but not enough to keep her from seeing through . . . she could "just barely" see appellant's face; "[e]nough to see, perhaps the color of the eyes," and to make out their faces. "It was distorted, but in studying that and looking at the profile, it wasn't distorted all that much. * * * You could still see their eyes, and being an artist (a portrait painter), I studied them very closely." She said she was "trying desperately to see, to get as much in (her) mind as (she) could as (to) the clothing and how they were dressed."

All three witnesses agreed that appellant was the taller of the two men who robbed the bank. Lange described appellant as around six feet or six-one in height, medium build, dark complexion, wearing dark clothing, a dark top with a darker pair, of pants; dark shirt and dark slacks. Winston described appellant's clothes as a maroon-type Banlon sweater with horizontal stripes, and said he wore a white ball-type cap. She described the shape of his face, nose and observed his abnormal eye, and noticed that the hands and fingers of both men were taped. Burks "vaguely remembered the clothing," but stated appellant had on a black tank top shirt, which was not striped.

The time between the robbery and the confrontation on the street corner was variously estimated at from five to fifteen minutes.

Each of the three witnesses made a positive identification and each testified that there is and was no doubt in his or her mind that appellant was the same person who participated in the robbery.

Appellant argues that the witnesses were under "a great deal of stress and excitement." That was undoubtedly true, but there is nothing to indicate that their fright and the emotions aroused by the experience prevented them from seeing and registering what was going on, or in remembering and recounting the details of the robbery. They testified in detail about the facts. They saw and identified the guns used. While Burks testified on direct examination that she was "scared to death" the robbers were

going to hurt the tellers, she explained on cross-examination that this was a "figure of speech"—that she did not "come unglued" until that night, "realizing what perhaps could have happened is when you really get scared." In *State v. Armbruster*, 541 S.W.2d 357, at 361 (Mo.App.1976), the Court makes clear that "[t]he law does not require, as a condition to the admissibility of the testimony of the victim of a crime, that he remain unruffled during its commission and aftermath." In *State v. Carter*, 571 S.W.2d 779 (Mo.App.1978), appellant's counsel argued that the victim was "hysterical" during the commission of the crime. Nevertheless, her identification of the appellant at a pre-trial confrontation some thirty minutes after the crime was held not to taint her in-court identification where there was no indication that she was so distraught as to impair her competency as a witness as a matter of law.

The trial court properly admitted in evidence the in-court identifications of the witnesses to the crime, for which there was a substantial basis, and which were shown to be reliable. There is in this record no substantial likelihood of misidentification. The admission of the in-court identifications did not deprive appellant of due process of law.

Additionally, Officer Moran made a definite in-court identification of appellant as one of the two men he saw run from the bank, and one of the two men who exited the cream-colored automobile on Park Lane.

Finally, *appellant identified himself* as one of the robbers by placing in his right shoe $677.00 of marked "bait money" taken from the bank; money recovered by the police when he was searched at the Sixth District Detective Bureau.

■ Appellant's second point:

"The trial court erred in allowing the prosecutor to argue to the jury in summation that the defense counsel was attempting to cloud the issues to confuse the jury, that as a defense lawyer it is her duty to do so, that confusing the issues will help her, and that confusing the issues is her purpose at trial in such comments

(a) Infer that defense counsel did not believe in her client's innocence or in the validity of his defense thereby severely prejudicing the defendant and denying him a fair trial;

(b) Accused defense counsel of engaging in trickery, bad faith or other action designed to prevent a fair resolution of the matter, thereby severely prejudicing the defendant and denying him a fair trial; and

(c) Denied the defendant a fair trial by the cumulative prejudicial effects of (a) and (b) above."

At the pre-trial hearing on the motion to suppress the identification evidence witness Lange, mistakenly confusing this case with "one of the previous lineups" in which he had been involved, testified that he attended a lineup at which he identified appellant as one of the robbers. In fact Lange did not attend any lineup in connection with this appellant. At the trial he corrected the mistake and testified that he did not attend any lineup in which appellant appeared. Anticipating that defense · counsel would seize upon and emphasize Lange's confusion and lapse of memory, the prosecutor in his summation to the jury argued that the issue was not what Lange remembered at the trial about events which occurred ten and a half months previously; that the issue with respect to Lange's testimony was the accuracy of Lange's memory ten minutes after the robbery, when he identified appellant on the corner of West Florissant and Park Lane. The prosecutor said, "that is the real issue, and anything else regarding his testimony is an attempt to cloud the issue, to confuse you, and that is not to say that Miss Dockery is being deceitful or dishonest in doing that. She is a defense lawyer. Under our system the defense lawyer is to look out for the rights of the client, as if the interest of the client is not going to jail, you can be sure that that is the interest—

MS. DOCKERY: I object. Mr. Fagan is suggesting that I would be deceitful or lie.

MR. FAGAN: I said no—

THE COURT: I think he did quite the contrary, but he said that you were doing it properly, so it will be overruled.

MR. FAGAN: The evidence can't be overcome. Maybe confusing the issues will help her client, and that is what she is here for."

The prosecutor went on to argue that the jury could convict based upon one identification, but that there were three positive identifications by witnesses inside the bank, plus the identification by Officer Moran as the men emerged from the bank.

In arguing that the prosecutor's comments implied that defense counsel did not believe in appellant's innocence or his defense and constituted an accusation of trickery, bad faith, etc. designed to prevent a fair resolution of the case, appellant reads into the words of the prosecutor something that is not there. These comments were directed at an argument open to the defense, but not yet made, in an effort to take the sting out of defense counsel's anticipated seizure upon Lange's blunder and to rivet the attention of the jury on what the prosecutor considered to be the real issue. There was no prejudicial error in the prosecutor's statement with respect to clouding the issue. It was within the discretion of the trial judge to permit such an argument in this case. Pertinent is *State v. Smith*, 431 S.W.2d 74 (Mo.1968), in which an argument was held nonprejudicial in which the prosecutor expressed confidence that the jury would "see through these clouds, these defense tactics to throw dust in your eyes * * *." Discounting the argument that the prosecutor was indicating that defense counsel was thereby attempting to hide evidence that would prove the guilt of the defendant, the Court said, 431 S.W.2d at 84–85:

"The expression, 'throwing dust in one's eyes,' is a common and generally understood expression used to convey the thought that one is attempting to confuse the real issue. * * * We find no prejudicial error in overruling the objection."

Appellant's third point:

"The trial court erred in allowing the prosecutor to argue to the jury in summation that the defense counsel had failed to call the doctor who treated the defendant for injuries after the defendant's arrest in that the doctor was equally available as a witness to both parties and would not be expected to testify favorably for the defendant had he been called and that such comments were therefore impermissible in closing argument."

Appellant was taken to the hospital following the giving of his brief confession. In final argument defense counsel said to the jury:

"If it (the confession) was voluntarily given, why did he (appellant) have to go to the hospital? And if there were no—if there was no beating, and if there was nothing found at the hospital, do you think—the State would have neglected to bring the doctor in to tell you that there was no beating?"

The portion of the prosecutor's argument to which appellant now objects is found in the following portion of the record of the State's closing argument:

"She (defense counsel) says, 'Where was the doctor to show there was no beating?' Where was the doctor to show that there was a beating? If this man was beaten by the police—

MS. DOCKERY: I object.

THE COURT: The objection is overruled.

MR. FAGAN: If this man was beaten by the—

MS. DOCKERY: I would like—

MR. FAGAN: She could have gotten the medical records.

MS. DOCKERY: I would like to state my objection.

THE COURT: You may.

MS. DOCKERY: My objection is that the defendant has no burden in this matter; that the burden of proof is on the State, and Mr. Fagan's statement would indicate to the jury other than that.

THE COURT: Objection will be overruled. The doctor was equally available to both parties."

While it is true, as appellant contends, that a prosecutor may not complain of defense counsel's failure to call a witness available to both parties, *State v. Valentine*, 587 S.W.2d 859, 864 (Mo. banc 1979); *State v. Collins*, 350 Mo. 291, 165 S.W.2d 647, 648 (Mo.1942), that rule is subject to an exception where, as here, the argument is made by way of retaliation in answering arguments made in the defendant's closing argument. *State v. Rapheld*, 587 S.W.2d 881 (Mo.App.1979); *State v. Taylor*, 567 S.W.2d 705 (Mo.App.1978); *State v. Johnson*, 561 S.W.2d 738 (Mo.App.1978); *State v. Cabell*, 539 S.W.2d 584, 587 (Mo.App.1976); *State v. Barron*, 465 S.W.2d 523 (Mo.1971).

Judgment affirmed.

STEWART, P. J., and STEPHAN, J., concur.