**STATE of Missouri, Respondent,**

v.

**Jon Marc TAYLOR, Appellant.**

**No. WD 33511.**

Missouri Court of Appeals,
Western District.

June 7, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Overruled and Denied Aug. 2, 1983.

Application to Transfer Denied
Sept. 20, 1983.

Susan Chapman, Public Defender, Sixth Judicial Circuit, Platte City, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Philip M. Koppe, Asst. Attys. Gen., Jefferson City, for respondent.

Before PRITCHARD, P.J., and MANFORD and NUGENT, JJ.

PRITCHARD, Presiding Judge.

By the verdicts of a jury appellant was convicted of sodomy, rape and robbery, and the trial court, in accordance with the recommendation of the jury, imposed sentences of 15 years, 15 years, and 10 years for the crimes, respectively, to be served consecutively. The issues here mainly concern the validity of identification procedures.

On March 23, 1980, Mrs. Wallie Monroe, a real estate agent, transported two men, claiming to be Gordon Grayson and his son, Mike, who posed as potential home-buyers, to a residence owned by Ray and Joan M. Gibson in Platte County, Missouri. Mrs. Monroe was in the presence of the two men for about 30 minutes, arriving with them at the Gibson residence shortly after 9:00 a.m., and Ray Gibson greeted them and brief introductions took place, then he went to the kitchen where he had been making coffee, followed by the older Grayson and Mrs. Monroe. The younger Grayson went into the family room where he was joined by Mrs. Gibson with whom there was a conversation lasting a few minutes. She then left the family room and joined the others in the kitchen, whereupon the older Grayson exhibited a small gun and told the Gibsons and Mrs. Monroe to lie on the floor. Ray Gibson thought the gun was a toy and did not respond. The younger Grayson then exhibited a larger gun saying, "This is no toy. Get on the floor now", and the three complied, their hands then being bound and their eyes taped closed. Gibson and Mrs. Monroe were placed in a kitchen closet, and Mrs. Gibson was told to lead the two men to the household valuables, which she did. She was then guided to an upstairs bedroom where she was forced to perform oral sex on a man. Then a man, whom she believed was the younger of the two, forced her to have sexual intercourse with him. After the two men left the house, the Gibsons discovered that cash ($21,000.00), silverware and other valuables had been taken from the house.

On that same day, Ray Gibson described the younger man to the police as being a tanned, white male, 23 years old, six feet tall, and weighing about 175 pounds. Mrs. Gibson also said the younger man was in the age bracket of 23 years. [It appears that appellant was then 19 years old.]

Ray Gibson was a commercial artist and on March 23, 1980, made drawings of the two Graysons. He had observed the younger one for 30 seconds. He was then wearing a mustache. When Ray Gibson did the sketch, he showed it to Mrs. Gibson, asking, "What do you think about this?" She testified at the pre-trial hearing, "I couldn't believe it, because it was perfect." This drawing was given to the police at the time and two days later, a composite rendering of the suspects was there made on March 25, 1980, and Ray Gibson testified that he drew the bulk of that composite sketch with the police artist. The Ray Gibson sketch was not provided defense counsel as a part of the request for discovery which was made on July 16, 1981.

Ray Gibson then became active in trying to find the suspects. He travelled at his own expense to Utah in an unsuccessful attempt to identify them. He later tentatively identified a man in St. Louis as being the older of the two men. Thereafter, through a sheriff's office, he paid $3,800.00 to an informant, one Eddie Robinson, who implicated suspects in Indiana, and in May, 1980, he travelled to Indiana for the purpose of trying to identify the two men who entered his house on March 23, 1980. On arriving there on May 5, 1980, he was taken to a police property room where he identified certain property as being that taken from his home in the robbery. The next day he returned to the property room and while there, he discovered 74 photographs, one of which he identified as being the younger suspect. On May 7, 1980, Ray Gibson viewed several line-ups of suspects, and in one consisting of older men, he identified the older of the two men who had entered his house, but that man was not the same one he had identified in St. Louis. He then saw a live line-up of younger men of which appellant was one, but he was unable to

identify him, being upset or perturbed by that failure. The following day he again viewed the 74 photographs along with photographs of other line-ups in which appellant had stood (in one of which appellant had a mustache), and then identified appellant from the line-up photograph as the younger of the two men. Ray Gibson was never able to identify appellant in a live line-up.

Several months prior to December 8, 1981, the date of the hearing of the motion to suppress identification testimony, Ray Gibson appeared in associate circuit court of Platte County, Missouri, for a preliminary hearing, being informed that it was for appellant, who was then present and attired in a prisoner jump suit which Gibson recognized as the kind worn by prisoners. Appellant was in shackles and handcuffs throughout the hearing, and he was the only accused in the courtroom. Gibson then made an in-court identification of appellant, and the motion to suppress it was denied. An objection was also made to the identification at trial on the same basis as was the pre-trial motion to suppress, and it was overruled, and Gibson again made an in-court identification of appellant.

Joan Gibson first saw the younger of the two men in the family room of the home, where she was with him and conversed with him about two minutes. She then went to the kitchen where the older man pointed a gun at her, and she looked at the younger man and the gun he had pointed at her. She looked at him for a short time, something like a few seconds. She was then ordered to the floor and her eyes were taped shut, remaining taped during the whole time of the rest of the events. Joan had never viewed a line-up or a photographic array. She was aware that her husband had made payment to an informant, that he had gone to Indiana, and he told her that he had made an identification by name. She had viewed the drawing that her husband had made. She was asked, "Q. (By Mr. Hassler) At the preliminary hearing, did you make your identification based on what was happening in the courtroom, or what

happened at your home on the 23rd of March? A. What had happened at my home. I saw the young man. I looked right at him. And when my husband did the sketch, and he held it up, he said, 'what do you think about this?' and I couldn't believe it, because it was perfect." At the trial, Joan Gibson testified further concerning her preliminary hearing identification: "Q. And it was a one on one type identification, is that ____ A. Well, over and above—while I was waiting in the area, not in the courtroom, I was in a position where I watched people come off that elevator all the time, and when those doors opened, I saw him, so I saw him then, before he actually—I actually identified him in the courtroom. Q. But, you know that Jon Taylor was to be present at that hearing. A. Yes. Q. And you knew before that hearing that your husband had made an identification of Jon Marc Taylor. A. Yes."

At the outset of the hearing on the pretrial motion to suppress evidence, appellant included therein a motion to suppress the evidence of the physical evidence of any items in the Indiana police property room, which would include the 74 photographs viewed by Ray Gibson, on the ground that they were not listed in the (Indiana) search warrant. The prosecutor conceded that part of the motion, and stated he was not going to ask for introduction, and would allow to be suppressed all of the items listed in the motion to suppress. Those items were not in evidence, but appellant, nevertheless, seeks further to have declared the in-court identification by Ray Gibson on the theory that it was "a fruit of the poisonous tree", i.e., an identification based upon illegally seized evidence—the 74 photographs in the Indiana police property room. Cited for that doctrine is *Wong Sun v. United States*, 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

■ Appellant contends "That the seventy-four photographs were seized in violation of appellant's Fourth Amendment to be free of unreasonable searches and seizures is beyond question." Assuming that to be

true, under the *Wong Sun* case, the identification of appellant by the comparison by Ray Gibson of the line-up photograph with the one he found among the 74 photographs must be found to have been an exploitation of the primary illegality. Although appellant argues that the police procedure of permitting Ray Gibson to examine property being held by it carried the implicit message that the correct suspects were in custody, which argument could be valid, the record is devoid of any suggestion from the Indiana police that appellant was the person from whom the property had been taken, or that he was "the man", which was the distinguishing situation in appellant's cited case of *Foster v. California*, 394 U.S. 440, 443, 89 S.Ct. 1127, 1128, 22 L.Ed.2d 402 (1969). Obviously, there was no suggestion from the police that appellant was the culprit. This is pointed up by the fact that Ray Gibson was unable to identify him in the line-up, because, as he testified, all the men he viewed wore stocking caps; all were without mustaches; and when the caps were removed, the hair was longer than that of the younger man when he was in Gibson's home. Appellant, who was in the line-up, was also bleached out, and light-skinned, when he had 1½ months earlier, in Gibson's home, appeared with a tan, and with short-cut military style hair. It was only later that in viewing other photographs of line-ups, one of which showed appellant with a mustache, he was able to pick appellant. The fact that there may have been an unlawful seizure of the items in the police property room does not render the testimony of an identification witness (below held to have a sufficient independent source) invalid. Compare *State v. Gregory*, 630 S.W.2d 607, 608[1] (Mo.App. 1982), holding that a possible illegal arrest did not require the suppression of the witness's later line-up identification as the fruit of the warrantless arrest. The argument in the *Gregory* case was that if appellant had not been illegally arrested, he would not have been in custody for viewing by the witness, was rejected. The similar contention here, that the illegally seized

property suggested that there were correct persons in custody, is likewise rejected.

■ Appellant argues that Ray Gibson had an initial inadequate opportunity (30 seconds) to observe the suspect at the time of the crime, and the claimed several separate, suggestive identifications procedures (in Indiana as above outlined), caused him to make an unreliable, but inevitable, identification of him. In *State v. McGrath,* 603 S.W.2d 518 (Mo.1980), the witness saw appellant twice face to face, once for about five seconds, and then for about three seconds. The court said, page 521[4–6], "Admittedly, the periods of observation of appellant by the witness were brief, but they were not so brief that, as a matter of law, they precluded an opportunity of the witness to identify appellant and retain that identification. He had two 'face-to-face' confrontations, and the contention that there was not 'sufficient opportunity' to observe appellant goes merely to the weight to be given by the jurors to the identification testimony. (Citing cases). * * A previous permissible identification does not disqualify the witness from later making an in-court identification based on an independent basis." See also *State v. Rice,* 522 S.W.2d 656 (Mo.App.1975) [three to five minute observance of defendant at the scene of the crime was based on ground independent of the alleged tainted, pretrial identification and was thus admissible]; *State v. Young,* 534 S.W.2d 585 (Mo.App. 1976) [three seconds observation is sufficient].

■ Sometime prior to the preliminary hearing, Ray Gibson saw appellant and J.C. Taylor in a courtroom where his replevin suit against them was pending. He also saw appellant, the only person accused of a crime, wearing handcuffs, leg shackles and a jail fatigue jumpsuit during the preliminary hearing. Appellant claims this courtroom confrontation, as well as that of Joan Gibson, during the preliminary hearing, was unduly suggestive because of appellant's appearance. The fact that both these witnesses observed appellant in the courtroom in handcuffs, shackles and jail clothes does not render their in-court identifications inadmissible. See *State v. Dickerson,* 568 S.W.2d 559, 561[3, 4] (Mo.App.1978); and these cases where the witnesses had seen suspects handcuffed or in police custody shortly after the crimes: *State v. Johnson,* 628 S.W.2d 904 (Mo.App.1982); *State v. Ralls,* 583 S.W.2d 289 (Mo.App.1979); and *State v. Terry,* 582 S.W.2d 337 (Mo.App. 1979).

■ Appellant also claims that the lapse of time between the time of the crime and Joan's preliminary hearing identification, some 1½ years, had a substantial deleterious effect upon her memory of him and on her ability to identify correctly. Certainly, the lapse of time is a factor to be considered. But it must be remembered that she too had good opportunity for more than two minutes to observe appellant in her home. The lapse of time goes merely to the weight of her testimony.

From the established measure of the totality of the circumstances, it cannot be said as a matter of law that the in-court identifications of Ray and Joan Gibson of appellant were inadmissible.

Appellant's final point involves claimed references by the prosecutor to the drawing of appellant made by Ray Gibson on March 23, 1980, in final argument, which drawing was not produced pursuant to appellant's request for discovery. There was, however, produced to appellant's counsel a composite drawing made at police headquarters, apparently on March 25, 1980. Neither of these drawings were introduced into evidence at the trial. Counsel for appellant argued: "If Mr. Gibson's drawing of the younger man was so good, so accurate, so reliable, why isn't it in here?" Then, the prosecutor in final argument made this statement: "As to the drawing, that testimony was made that occurred. She has a copy of the drawing. It could be introduced by her just as easily as by us, if she wants it in the record." Appellant's counsel then objected, stated that she did not have a copy of the drawing by Ray Gibson, and moved for a mistrial, "because that is highly prejudicial". In the colloquy before the

court, outside the hearing of the jury, there is apparent confusion as to what drawing was referred to by counsel. The composite drawing was referred to by counsel for the state as being the one drawn by Ray Gibson, and counsel stated that the state had no other drawing than the composite one, which counsel for appellant did have. The court then sustained appellant's objection, and on request, instructed the jury to disregard the last statement of the prosecutor.

On the hearing on the motion for new trial, the matter was gone into further. The composite drawing was then introduced into evidence, and Joan Gibson testified that she did not know where the drawing was which her husband had made on March 23, 1980, and that the composite drawing was the one her husband and an artist downtown had made which was published. Ray Gibson testified similarly, and added that the last he saw of the drawing he had made was at the Kansas City, Missouri, police artist's office. He actually did the bulk of the drawing there of the composite, and he considered it to be his. It was stipulated that the composite drawing was the one produced on discovery. The prosecutor testified that up to the time of trial, he always thought that the composite drawing was the one and only sketch that had been made, and it was the only one that the state had.

■ Although the prosecutor was aware from the testimony adduced in the trial of the case that a drawing had been made on March 23, 1980, of the younger man, his failure to differentiate between it and the composite one which he had in his possession and which was supplied to appellant's counsel was but a technical error, in the sense that he should have perhaps referred to the drawing he meant. Obviously, neither the prosecutor nor appellant's counsel had the original drawing in their possession. Only the composite drawing had been produced, and it was one which the testimony showed was also made by Ray Gibson, and even it was not before the jury. All of these facts were presented in colloquy during final arguments, and it cannot be said,

under the obvious confusion that existed, that the prosecutor was guilty of any impropriety, or that the trial court should be convicted of error in denying the request for the drastic remedy of mistrial. Any error implicit in the prosecutor's argument must have been removed by the sustaining of appellant's objection and the instruction to the jury to disregard his statement on the subject. See the representative case of *State v. Smith,* 547 S.W.2d 216, 217[2] (Mo. App.1977), where, as here, the trial court sustained the objections to the prosecutor's comments and ordered the jury to disregard them, the court holding that the trial court was within its discretion in finding that the immediate curative action dispelled any prejudice. All of appellant's contentions are overruled.

The judgment is affirmed.

All concur.