James Willie Cochran, the appellant, was indicted for the offense of robbery when the victim is intentionally killed. Alabama Code § 13A-5-31(a)(2) (1975). A jury found him "guilty of the capital offense as charged in the indictment", and, after a hearing, recommended that his punishment be fixed at death. The trial judge accepted this recommendation and sentenced Cochran to death by electrocution. Eight issues are raised on appeal.
 I
The procedural restructuring of the 1975 Death Penalty Law by the Alabama Supreme Court in Beck v. State, 396 So.2d 645
(Ala. 1980), was a constitutionally permissible exercise of judicial power. Potts *Page 1165 v. State, 426 So.2d 886 (Ala.Cr.App. 1982), affirmed, Ex partePotts, 426 So.2d 896 (Ala. 1983).
 II
Cochran argues that the principles of former jeopardy barred his trial after a mistrial had been declared in a former trial due to alleged "prosecutorial overreaching".
In August of 1977, Cochran was originally tried for a capital offense involving the murder of Stephen Jerome Ganey. The trial ended in a mistrial granted pursuant to Cochran's motion. The mistrial was granted for two reasons: (1) because the District Attorney failed to reveal that material eyewitness, Mary Allison Jones, had been under psychiatric care and (2) because eyewitness, Horace C. Sutterer, identified Cochran in court although he had previously failed to make positive extrajudicial identifications. The trial judge's order granting the mistrial is as follows:
 "Defendant, by his attorneys, makes oral motion for a mistrial by reason of information known to the office of the District Attorney that witness Mary Allison Jones, age 18, has been under the care of a psychologist, Dr. Lyons, since she testified in the Habeas Corpus and suppression hearings held in this case in March 1977, which information was not known to the defendant's attorneys until after witness Jones had testified at the trial on the merits on August 16, 1977. Said witness made a positive identification of defendant while testifying on August 16, 1977, which identification she did not make in the hearing before this Court in March 1977; it further appearing to this Court that the said Dr. Lyons invokes her psychologist privilege against testifying as to the facts and said witness Jones refuses to, if recalled by defendant to testify, answer questions relating to the basis of her psychological problems and defendant's attorneys contend they need opportunity to inquire into this development and information to prepare adequate cross-examination of said witness. In addition witness Sutterer on the stand on August 16, 1977, made a positive identification, not being able to identify defendant in March 1977 and the Court order following said hearing did not rule on suppression motions for Jones and Sutterer inasmuch as they did not make identification. Defendant moves to suppress testimony of said two witnesses.
 "It appears to the Court that manifest necessity and the ends of public justice require a mistrial. Defendant and all attorneys being present, it is Ordered and Adjudged that a mistrial shall be and is hereby declared and ordered and a new trial is not precluded."
In January of 1978, Cochran was tried a second time for a capital offense. His conviction was reversed on appeal on authority of Beck, supra.
In March of 1982, Cochran was tried a third time and convicted. The record contains no plea of former jeopardy filed at any time. The record also does not show any reason for the prosecutor's failure to disclose the information which was one of the reasons for granting the mistrial.
In Oregon v. Kennedy, 456 U.S. 667, 675, 102 S.Ct. 2083,2089, 72 L.Ed.2d 416 (1982), the United States Supreme Court held that retrial of a defendant following a mistrial is permitted unless the prosecution has engaged in misconductintended to provoke the defendant to request a mistrial.
 "Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. . . . Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of Double Jeopardy to a second trial after having succeeded in aborting the first on his own motion."
. . . . *Page 1166 
 "But we do hold that the circumstances under which such a defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial." 456 U.S. at 675-76, 679, 102 S.Ct. at 2089-90, 2091.
Reprosecution is not barred by merely "grossly negligent" conduct. United States v. Singleterry, 683 F.2d 122, 123 n. 1 (5th Cir.), cert. denied, 459 U.S. 1021, 103 S.Ct. 387,74 L.Ed.2d 518 (1982). See Annot., 98 A.L.R.3d 997 (1980). From a silent record this Court cannot infer that the prosecutor intentionally withheld the information in order to provoke a mistrial. Accordingly, we find that the declaration of the mistrial in Cochran's first trial did not bar his second and third trials.
 III
During the qualification of the jury venire, Juror Cochran stated, "I don't know whether or not I know him (the defendant) or not. He could be in that family and not know him. That's my husband's name." She also stated that she was "familiar" with the incident.
Mrs. Cochran stated that she did not actually know whether or not she was related to the defendant. Under questioning by the assistant district attorney she indicated that thepossibility that there might be a relation would affect her ability to sit as a juror and that she "hoped" but was not sure she could base her verdict solely on the testimony from the witness stand. In response to a question by the trial judge, she stated that she believed that she would not be able to base her verdict solely on law and evidence "because of the name or the possibility that you are related."
A juror should be impartial between the parties. Wilson v.State, 243 Ala. 1, 8 So.2d 422 (1942). Probable prejudice for any reason disqualifies a prospective juror. Alabama Power Co.v. Henderson, 342 So.2d 323 (Ala. 1976). What this Court said inCarter v. State, 420 So.2d 292, 295-96 (Ala.Crim.App. 1982), is applicable here:
 "Although the prospective juror's answers indicated reluctance and hesitation rather than definite inability to decide the case on the evidence alone, the trial judge was in a position to observe the demeanor and determine the prejudice of the venireman. The decision of a trial court to disqualify a juror on a challenge for cause is entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion."
Here, we are really dealing with two different grounds of challenge for cause. As appellant Cochran correctly observes, it does not appear that Juror Cochran was actually related to him or that if there were any relation it was within the statutory degree of disqualification. Alabama Code §12-16-150(4) (1975). However, Juror Cochran clearly indicated that even the probable existence of a relationship would affect her verdict. "A juror is incompetent whose answers show that he [or she] would follow his own views regardless of the instructions of the court." Barbee v. State, 395 So.2d 1128,1131 (Ala.Cr.App. 1981). For this reason, the trial judge acted within his discretion in excusing Juror Cochran for cause. "The fact that another judge or court would not have reached the same legal conclusion as the trial judge in this particular case does not necessarily mean or establish an abuse of discretion." Barbee, 395 So.2d at 1131.
 IV
Cochran contends that much of the evidence against him was obtained as a result of an illegal search and seizure. We disagree.
The facts on this issue are not disputed. On the night of the robbery, after Cochran had been arrested and the victim had been found, Homewood Police Officer Johnny Thacker was sent to the parking lot of the A P Grocery Store, which had been robbed. He was for "an out of *Page 1167 
place vehicle, one that did not appear to belong." He checked the registration of the license tags on some of the automobiles he observed. He found all the vehicles locked except a 1965 Chevrolet. That car was unlocked and the keys were in the ignition. It was registered to Ned L. George. While waiting on the registration report, Officer Thacker "observed a wallet partially protruding from between the front seat and the back of the front seat." He opened the car door, removed the wallet, examined its contents, and discovered a social security card belonging to James Cochran. At that time he had no information about the person or automobile involved in the robbery. He returned the wallet to its original position because he had "no reason to believe it was involved in this thing at all."
On returning to City Hall, he learned that Cochran had been arrested and connected him with the name in the wallet. He reported this information to his superior and the Chevrolet was impounded that night. The wallet, a social security card and a checkbook were removed from the automobile and introduced in evidence at trial against Cochran. This evidence tended to connect Cochran with the robbery by placing him in the vicinity of the crime.
Although the Chevrolet was registered in the name of Ned L. George, Bobbie Burpo testified that she owned the car which she "bought" from George, who was her uncle. While Ms. Burpo was in the hospital, she "gave" the car to her aunt, Dorothy Cochran, who was the defendant's wife.
After the cases of Rakas v. Illinois, 439 U.S. 128,99 S.Ct. 421, 58 L.Ed.2d 387 (1978), United States v. Salvucci,448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), and Rawlings v.Kentucky, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980), a defendant wishing to establish standing to challenge the introduction of evidence obtained as a result of an alleged violation of the Fourth Amendment must demonstrate that he has a legitimate expectation of privacy in the area searched.Collier v. State, 413 So.2d 396 (Ala.Cr.App. 1981), affirmed, Exparte Collier, 413 So.2d 403 (Ala. 1982). The burden of proof is on the defendant to establish standing. Collier, 413 So.2d at 400; 3 W. LaFave, Search and Seizure § 11.2(b) (1978). Cochran has asserted no interest whatsoever in the Chevrolet. He has claimed no right to own or use the vehicle. He has not claimed that he was driving it or even that he knew his wife had it. He took no measures to insure the privacy of anything inside the automobile, as the keys were in the ignition, the car was not locked, and his wallet could be seen on the front seat. He was not in control over the area searched or the item seized. The item seized was in plain view. The automobile was parked in a public parking lot. In short, other than the facts that Cochran's wallet was found in the car and that the vehicle had been loaned to his wife, there was no connection established for purposes of standing between Cochran and the Chevrolet. It was not even established that Cochran and his wife were living together at this time. Under these circumstances, we are unwilling to recognize any reasonable expectation of privacy interest by Cochran in the vehicle.
A valid argument can also be made that Cochran abandoned the Chevrolet for constitutional purposes when he fled the scene of the crime on foot leaving the automobile behind in the parking lot, unlocked and with the keys in the ignition. People v.Hampton, 198 Colo. 566, 603 P.2d 133 (1979); People v.Washington, 90 Ill. App.3d 631, 45 Ill.Dec. 837, 413 N.E.2d 170
(1980), cert. denied, 454 U.S. 846, 102 S.Ct. 162,70 L.Ed.2d 132 (1981); 1 W. LaFave, Search And Seizure § 2.5(a) (1978).
 V
Cochran contends that he was denied due process of law when the trial judge permitted two witnesses to make in-court identifications at trial because of the use of suggestive pretrial identification procedures that resulted in a substantial likelihood of irreparable misidentification. His argument is grounded on the fact that both witnesses identified someone other than *Page 1168 
Cochran at lineups conducted shortly after the crime.
The robbery was committed and Cochran was arrested on the night of November 4, 1976. The first lineup was conducted on the afternoon of the 7th. Mary Allison Jones, the cashier at the A P Grocery Store at the time of the robbery, identified someone other than Cochran at this lineup. After the lineup, an officer informed Ms. Jones that she had selected the wrong person but she was not given another opportunity to identify the robber.
Ms. Jones was unable to "positively" identify Cochran as the robber at the preliminary hearing held in December of 1976 and at a habeas corpus hearing held in March of 1977. She first identified him at his first trial in August, 1977. She also identified Cochran at his second trial in February of 1979. At that trial she testified:
 "I saw him there [at the preliminary hearing]. I walked into the courtroom with my mother and my uncle and I told my mother that that was him sitting behind or to the side of the Judge's podium or whatever. Right then I recognized him and he was sitting with some other men over there. Then we were called out of the courtroom, somebody came in and called us out, and at that time that's when I recognized him. I just knew it was him. To be positive I guess I waited. At the preliminary hearing when they asked me if I was positive, it was over fifteen minutes since the time that I had seen him and I couldn't say I was positive. It took a lot more thought than that on my part."
At the third trial, which forms the basis of this appeal, Ms. Jones identified Cochran, testified that she was "positive", and stated why she changed her mind:
 "What changed my mind? That did change my mind. It changed my mind because I knew I spotted him in that courtroom at the preliminary hearing. And I knew how positive it was. And then getting in here and asking me if I'd bet my life on it, yes, I wasn't sure, you know. But he was the same man I saw there. That's what changed my mind. * * * I'd hate to [bet my life on it]. I don't see why I should have to bet my life on it."
The second eyewitness in this case was Belford F. Peters. He was about to enter the A P on the night of the robbery when he observed a man armed with a pistol leaving the store, followed by the assistant manager. At a lineup conducted four days later, on the evening of November 8, 1976, he identified someone other than Cochran. Peters testified at the habeas corpus hearing that as he was leaving the lineup he realized that he had identified the wrong person and that at that time he told a police officer that the man he "had identified had too big a gut, that it wasn't him."
Homewood Police Detective Laird J. Sharpe, who conducted both lineups, testified that Mr. Peters never did change or even discuss his testimony.
There is no indication that Peters was present at the preliminary hearing. At the habeas corpus hearing, Peters identified Cochran: "Well, I'm positive that that's the man." Peters also identified Cochran at the first trial.
Horace Sutterer did not testify at Cochran's third trial. However, he viewed the same lineup as Mr. Peters and independently identified the same individual as did Peters. The individual that Sutterer and Peters identified was not the same person that Ms. Jones had identified. At the habeas corpus hearing, Sutterer testified that "I had told the police officers when I viewed the lineup that the defendant, the person that I saw in the lineup, looked like the man that I saw that night without the mustache." At the habeas corpus hearing, Sutterer testified that Cochran "looks like" the robber: "This man now looks more like the man that I saw that night than anyone I saw in the lineup that time. . . . As far as swearing right now that that is the man that I saw, I'm reluctant to do so." *Page 1169 
There was evidence that Cochran's mustache had been removed and his hair had been rearranged between the time after his arrest and before the lineups. Apparently, this change was not continued and Cochran had his original facial hair pattern at the time of the preliminary hearing. When arrested, Cochran's false teeth were found in his pocket.
There exists a due process right to the exclusion of unreliable identification testimony that results from procedures that are both unnecessarily suggestive and conducive to irreparable mistaken identification. Stovall v. Denno,388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). The primary focus in the due process inquiry is on the reliability of the identification and identification evidence derived from an unnecessarily suggestive source need not be excluded if the totality of the circumstances indicates that it is reliable.Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243,53 L.Ed.2d 140 (1977).
In Manson, the Supreme Court adopted the five factors enumerated in Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375,34 L.Ed.2d 401 (1972), to determine the reliability of the identification: the witness' opportunity to view the criminal at the time of the crime; the witness' degree of attention at the time of the crime; the accuracy of the witness' prior description of the criminal; the witness' level of certainty when identifying the suspect at the confrontation; and the length of time between the crime and the confrontation.
Cochran argues that the application of these five factors to the facts of this case requires the conclusion that the in-court identifications by Jones and Peters were unreliable and should have been suppressed. This argument overlooks the two-pronged inquiry of Manson. After Manson, courts have employed a two-step analysis to determine whether due process has been violated by the admission of identification testimony. "A defendant first must prove that the identification procedure was unnecessary and impermissibly suggestive, and courts then will consider the reliability of the identification by balancing the Biggers factors against the suggestiveness of the procedure." Project: Thirteenth Annual Review of CriminalProcedure: United States Supreme Court And Courts of Appeal1982-83, 72 Geo. L.J. 249, 334 (1983), citing United States v.Briggs, 700 F.2d 408, 412 (7th Cir.), cert. denied,461 U.S. 947, 462 U.S. 1110, 103 S.Ct. 2129, 2463, 77 L.Ed.2d 1307
(1983); Brayboy v. Scully, 695 F.2d 62, 65 (2d Cir. 1982), cert. denied, 460 U.S. 1055, 103 S.Ct. 1505, 75 L.Ed.2d 935 (1983) ("Since the identification procedure was not impermissibly suggestive, the issue of the reliability of Kolkmann's identification of Brayboy is not before us."); United States v.Harper, 680 F.2d 731, 734 (11th Cir.), cert. denied,459 U.S. 916, 103 S.Ct. 229, 74 L.Ed.2d 182 (1982) ("First, as a threshold inquiry, the Court must decide whether the identification procedure was unnecessarily suggestive. A finding of impermissible suggestiveness raises concern over the reliability of identification and triggers closer scrutiny by the Court to determine whether such a procedure created a substantial risk of misidentification.").
In Brazell v. State, 369 So.2d 25, 28-29 (Ala.Cr.App. 1978), cert. denied, 369 So.2d 31 (Ala. 1979), this Court observed:
 "In determining the constitutional adequacy of pretrial identification procedures and the admissibility of identification testimony, the central question is whether, under the totality of the circumstances, the identification was reliable. Manson, supra. This determination involves the application of a two-pronged test.
 " '(T)he required inquiry is two-pronged. The first question is whether the initial identification procedure was "unnecessarily" [Stovall] or "impermissibly" [Simmons] suggestive. If it is found to have been so, the court must then proceed to the question whether the procedure found to have been "unnecessarily" or "impermissibly" suggestive was so "conducive to irreparable mistaken identification" *Page 1170 
[Stovall] or had such a tendency "to give rise to a very substantial likelihood of irreparable misidentification" [Simmons] that allowing the witness to make an in-court identification would be a denial of due process.' United States ex rel. Phipps v. Follette, 428 F.2d 912, 914-915
(2d Cir. 1970)."
Here, the two lineups were not suggestive in any manner. There is no evidence to indicate that the two pretrial hearings were unnecessarily suggestive. They are characterized as not being unnecessarily suggestive because any adversary proceeding at which the accused is present could be suggestive to some degree. See State v. Taylor, 655 S.W.2d 633, 637 (Mo.App. 1983) (Fact that both witnesses observed defendant in courtroom during preliminary hearing, in handcuffs, shackles, and jail clothes, did not render their in-court identification inadmissible.).
This case does not involve the type of pretrial identification procedures consisting of successive showups. Such procedures have been routinely condemned as highly suggestive and conducive to irreparable mistaken identification. Annot., 39 A.L.R.3d 791, § 11 (1971). See alsoFoster v. California, 394 U.S. 440, 89 S.Ct. 1127,22 L.Ed.2d 402 (1969). We find no pretrial identification procedures employed in this case so suggestive or defective as to render the in-court identifications inadmissible as a matter of law. Cf. Foster, 394 U.S. at 442-43, 89 S.Ct. at 1128. The central issue here is what effect should a mistaken pretrial identification have on a witness' in-court identification of the accused?
The general rule is that a victim's previous mistaken identification affects the weight and credibility rather than the admissibility of the testimony. Agee v. State,424 So.2d 1368, 1370 (Ala.Cr.App. 1982), and cases cited therein. See alsoProctor v. State, 424 So.2d 705, 709 (Ala.Cr.App. 1982). "[O]ur review of relevant case law suggests that a witness's prior inability to identify a defendant goes to the credibility of the in-court identification and not to its admissibility, and thus raises a proper question of fact for the jury to determine." United States v. Briggs, 700 F.2d 408, 413 (7th Cir. 1983), cert. denied, 461 U.S. 947, 462 U.S. 1110,103 S.Ct. 2129, 2463, 77 L.Ed.2d 1307, 1340 (1983); Johnson v. State,453 So.2d 1323 (Ala.Cr.App. 1984).
 "Failure to identify a defendant does not automatically bar the testimony of a witness. United States v. Serlin, 7 Cir., 538 F.2d 737, 747-748. The failure of a witness to identify presents 'nothing more than a matter for factual argument to the jury.' United States v. Scarpellino, 8 Cir., 431 F.2d 475, 477. The effect is on the weight, not the efficacy, of the evidence. United States v. Rizzo, 7 Cir., 418 F.2d 71, 81, cert. denied, 397 U.S. 967, 90 S.Ct. 1006, 25 L.Ed.2d 260." United States v. Skipworth, 697 F.2d 281, 284 (10th Cir. 1983).
This rule applies even where the witness identifies someone other than the accused. Agee, 424 So.2d 1370-71, and cases cited therein. See also United States v. Saint Prix,672 F.2d 1077, 1084 (2nd Cir.), cert. denied, 456 U.S. 992,102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982); McNeary v. Stone, 482 F.2d 804,806 (9th Cir.), cert. denied, 414 U.S. 1071, 94 S.Ct. 584,38 L.Ed.2d 478 (1973).
Here, the misidentifications of both Jones and Peters were thoroughly "aired" before the jury. United States v. O'Neal,496 F.2d 368, 372 (6th Cir. 1974). Under the facts and circumstances of this case, the failure of Jones and Peters to identify Cochran as the robber properly went to the weight and credibility of their testimony before the jury rather than its admissibility. The record supports the implication that the misidentifications which occurred in the lineups were attributable to or, at least influenced by, the fact that Cochran had altered his appearance after the crime and his arrest and before the lineups. See Holden v. State,602 P.2d 452, 457 (Alaska 1979) ("What caused her original uncertainty was the fact that Holden had had a beard and long hair when he assaulted her, *Page 1171 
and at the trial his hair was cut and his beard shaved off."). Had we found evidence of impermissible suggestiveness present in the lineups and pretrial hearings, we would not hesitate to find both Jones' and Peters' in-court identifications inadmissible and reverse this case. United States v. Gambrill,449 F.2d 1148 (D.C. Cir. 1971).
In reaching this conclusion, we are acutely aware of the inherently unreliable nature of eyewitness identification.Watkins v. Sowders, 449 U.S. 341, 350-51, 101 S.Ct. 654,659-60, 66 L.Ed.2d 549 (1981) (Brennan, J., dissenting); UnitedStates v. Wade, 388 U.S. 218, 228, 87 S.Ct. 1926, 1932,18 L.Ed.2d 1149 (1967); United States v. Danzey, 594 F.2d 905, 916
(2nd Cir.), cert. denied, 441 U.S. 951, 99 S.Ct. 2179,60 L.Ed.2d 1056 (1979) (" '[M]ost of the spectacular miscarriages [of justice] have been due to the wrong identification of the defendant as a culprit.' "). We are also cognizant of the fact that "(o)ne of the most serious and most frequently arising indications that a witness's trial identification may be erroneous is the fact that the witness has previously identified someone else as the perpetrator of the crime." P. Wall, Eyewitness Identification In Criminal Cases 101 (1965). Generally, see N. Sobel, Eye-Witness Identification: Legal AndPractical Problems (1972), and L. Taylor, EyewitnessIdentification (1982).
Despite these impeaching factors, we note that both eyewitnesses had a good opportunity to view Cochran under favorable lighting conditions at a time when their attention would have focused on him. Furthermore, we must stress that a definite reason can be attributed for the initial misidentifications — the change in Cochran's appearance. For all these reasons, we find that the in-court identifications by Jones and Peters were properly admitted.
Under the evidence presented in this case, we have no reasonable doubt that Cochran is guilty of the capital robbery-intentional killing as charged. In support of this we recite the findings of fact by the trial judge in his written order on imposition of the death sentence.
Finding of Fact From Guilt Phase of the Trial
 "Stephen Jerome Ganey was the assistant manager of the A P Grocery Store on Green Springs Road, Homewood, Jefferson County on November 4, 1976. Between 9:30 and 10:00 P.M. the store was robbed by the defendant James Willie Cochran. Between $200 and $700 or more was taken by the defendant. Identification was made by two witnesses. "Court finds that after obtaining the money, Defendant left the premises and was followed by Ganey. It was a 'stop and go' situation. Defendant saw Ganey follow him and would stop, point or exhibit his revolver and Ganey would stop, then Defendant would move on and Ganey would follow. This continued for about half a block until the two men left the sight of witnesses going in the general direction of a mobile home park and a motel complex to the north of the A P shopping center. Possibly a half a mile was distance from A P to the mobile home park and the motel.
 "The Court further finds that law enforcement personnel virtually surrounded the area and in the next twenty minutes a shot was heard. The defendant was taken into custody after discarding a revolver. Nearly $250.00 with an A P band around it was taken from his pocket. He was arrested about 10:18 P.M. The body of the victim, Ganey, was recovered an hour later under a trailer. The Court further finds as a fact that the defendant intentionally killed Stephen J. Ganey. This Court is not attempting to set forth in minute detail testimony of twenty witnesses all of whom gave material testimony."
 VI
Cochran contends that during the sentencing hearing the trial judge incorrectly instructed the jury on the burden of proof of mitigating circumstances. Cochran argues that the correct burden was stated in *Page 1172 
the 1981 Death Penalty Act which states: "When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence." Alabama Code § 13A-5-45(g). The 1975 Death Penalty Act under which Cochran was tried did not contain any provision regarding the burden of proof of mitigating circumstances.
In this case the trial judge instructed the jury at the sentencing phase that the "State must convince you beyond a reasonable doubt and to a moral certainty of the aggravating factors, but the defendant need only reasonably satisfy you from the evidence of the presence of mitigating factors. In other words, you just have to be reasonably satisfied because the burden is always on the State, always on the State."
Although this issue has not been specifically addressed in a majority opinion by any Alabama appellate court, the cases imply that under the 1975 Death Penalty Act the burden to show mitigating circumstances is on the defendant.
In Beck v. State, 365 So.2d 985, 1002 (Ala.Cr.App.), affirmed, 365 So.2d 1006 (Ala. 1978), reversed on other grounds,447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), the appellant "insisted that the sentencing procedure conducted by the court . . . violated due process in that the appellant was required to prove mitigating circumstances." Although this Court did not specifically answer this question, it held that "the new Alabama death penalty statute more than adequately meets due process requirements." Beck, 365 So.2d at 1003. In his concurring opinion in Jacobs v. State, 361 So.2d 640, 647
(Ala. 1978), Chief Justice Torbert recognized that "the burden of establishing mitigating circumstances must realistically rest with the defendant (State v. Knapp, 114 Ariz. 531,562 P.2d 704 (1977); State v. Richmond, supra [114 Ariz. 186,560 P.2d 41 (1976), cert. denied, 433 U.S. 915, 97 S.Ct. 2988,53 L.Ed.2d 1101 (1977)])." This language was quoted with approval in Richardson v. State, 376 So.2d 205, 224
(Ala.Cr.App. 1978), affirmed, 376 So.2d 228 (Ala. 1979). In his concurring opinion in Cook v. State, 369 So.2d 1251, 1260
(Ala. 1978), Justice Maddox remarked, "I disagree with any suggestion that the burden is on the state or the judge toproffer mitigating evidence — the only obligation on the state is, as Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954,57 L.Ed.2d 973 (1978)] holds, to permit the defendant to present mitigating evidence. Alabama permits that."
These statements are consistent with the holdings of other state courts that it is constitutionally permissible to place the burden of proving mitigating circumstances on the defendant. State v. Harding, 137 Ariz. 278, 670 P.2d 383, 398
(1983); Tichnell v. State, 287 Md. 695, 415 A.2d 830, 848-50
(1980); Fitzpatrick v. State, 638 P.2d 1002, 1013 (Mont. 1981);State v. Moore, 210 Neb. 457, 316 N.W.2d 33, 46, cert. denied,456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982); State v.Pinch, 306 N.C. 1, 292 S.E.2d 203, 223, cert. denied,459 U.S. 1056, 103 S.Ct. 474, 74 L.Ed.2d 622 (1982); Commonwealth v.Zettlemoyer, 500 Pa. 16, 454 A.2d 937, 963-64 (1982), cert. denied, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983).
Cochran argues that "(t)here is every reason to believe that the intention of the Legislature to place the burden of disproving the existence of mitigating circumstances on the state once the defendant has introduced evidence supporting a mitigating circumstance as expressed in the 1981 Death Penalty Act was the intention of the Legislature at the time the 1975 Act was passed." Appellant's Brief, pp. 60-61. We find such argument lawfully and reasonably unsound.
Cochran relies chiefly on McWhorter v. State Board ofRegistration ex rel. Baxley, 359 So.2d 769 (Ala. 1978), for the proposition that, when the Legislature amends or replaces a statute, the subsequent legislation must be considered in trying *Page 1173 
to determine the intent behind the prior legislation. The application of this general rule of statutory construction in this particular situation is contrary to the specific language of the new statute. Section 13A-5-57(b) provides:
 "(b) Sections 13A-5-30 through 13A-5-38 [formerly § 13-11-1 through § 13-11-9] are hereby repealed. All other laws or parts of laws in conflict with this article are hereby repealed. This repealer shall not affect the application of preexisting law to conduct occurring before 12:01 A.M. on July 1, 1981." (Emphasis added.)
This section indicates that Alabama's 1981 Death Penalty Act (§ 13A-5-39 through § 13A-5-59) constituted a significant departure from the pre-existing death penalty act. Under these circumstances, any application of the principle announced inMcWhorter would not indicate that the Legislature intended to accomplish in the 1975 Death Penalty Act what it actually achieved in the 1981 Act. Thus, Cochran's argument that the Legislature intended to place the burden on the State to disprove any mitigating circumstance is without merit.
 VII
Cochran contends that at the sentencing hearing the trial judge should have instructed the jury on the specific mitigating circumstances offered in his behalf. Cochran argues that the trial judge should have specifically instructed the jury that evidence of his good character and his employment record were examples of nonstatutory mitigating circumstances which the jury could consider as well as "the lack of direct evidence of his guilt and the fact that he did not sit down and plan the killing but, to the contrary, attempted to persuade the store manager to go back into the store."
In Chenault v. Stynchcombe, 581 F.2d 444, 448 (5th Cir. 1978), the United States Court of Appeals for the Fifth Circuit held that, at the sentencing phase of the trial, the judge must "clearly instruct the jury about mitigating circumstances and the option to recommend against death." Chenault was followed by Spivey v. Zant, 661 F.2d 464 (5th Cir. 1981), cert. denied,458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982); Goodwinv. Balkcom, 684 F.2d 794 (11th Cir. 1982), cert. denied,460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983); and Westbrookv. Zant, 704 F.2d 1487 (11th Cir. 1983).
In Tucker v. Zant, 724 F.2d 882, 891-92 (11th Cir. 1984), the Eleventh Circuit summarized and consolidated the holdings of these last three cases.
 "In Spivey v. Zant, 661 F.2d 464, 467-72 (5th Cir. Unit B 1981), cert. denied, 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982), the Fifth Circuit held that jurors must receive instructions that adequately guide their consideration of mitigating factors.
 "In most cases, this will mean that the judge must clearly and explicitly instruct the jury about mitigating circumstances and the option to recommend against death; in order to do so, the judge will normally tell the jury what a mitigating circumstance is and what its function is in the jury's sentencing deliberations.
 "Id. at 471 (footnote omitted). The Court stated that mitigating circumstances are those that 'do not justify or excuse the offense, but which, in fairness or mercy, may be considered as extenuating or reducing the degree of moral culpability and punishment.' Id. at 471 n. 8. In Goodwin v. Balkcom, 684 F.2d 794, 798803 (11th Cir. 1982), cert. denied, [460] U.S. [1098,] 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983), this Court held that the instruction that jurors were to hear 'additional evidence in extenuation, mitigation, or aggravation of punishment' failed to meet Spivey's
constitutional minimum because '[n]owhere does the charge even slightly hint about the option to impose life imprisonment even though aggravating circumstances are found.' Id. at 802. Most recently, this Court held that the Goodwin
instruction *Page 1174 
is insufficient even when coupled with an instruction that makes clear the jurors' ability to sentence the defendant to life imprisonment if they find an aggravating circumstance. Westbrook v. Zant, 704 F.2d 1487, 1503 (11th Cir. 1983). 'Although the charge authorized the jury to consider circumstances in extenuation or mitigation . . . the court failed to explain what function such a consideration would play in sentencing deliberations.' Id. at 1503. Taken together, these cases require the trial court to (1) instruct the jury that it must consider mitigating evidence, (2) define mitigating factors and explain their function in sentencing deliberations, and (3) inform the jurors that a finding of aggravating circumstances does not require them to return a death sentence." Tucker, 724 F.2d at 891.
Viewing the judge's charge as a whole as we must,Gosa v. State, 273 Ala. 346, 350, 139 So.2d 321 (1961); Mosleyv. State, 241 Ala. 132, 136, 1 So.2d 593 (1941), we find that the charge meets all the requirements of Spivey, Goodwin,Westbrook, and Tucker.
The judge instructed the jury that it must consider the mitigating evidence: "Now, you in this hearing are considering the aggravating circumstances. That is really the crux of this hearing."
He defined the mitigating factors and explained their function in sentencing deliberations.
 "Mitigating circumstances mean a diminution or extenuating circumstance, something that eases, we'll say eases to put it as I would say as a plain person without being a lawyer or judge, it eases the crime itself. . . . Mitigating circumstances makes it less or lessens it."
The judge read, reread, and explained to the jury the seven statutory mitigating circumstances listed in Alabama Code § 13A-5-36. He made copies of the statute "for each juror so you will know what the mitigating circumstances are." He repeatedly emphasized that the statutory list of mitigating circumstances was not exclusive.
 "Now, I'll repeat this I know three or four times. This list which I am reading you is not exclusive. Your consideration of mitigating circumstances; that is, extenuating circumstances, that's what this means, is not limited to this list. The cases clearly hold and we all understand, there's no dispute about it, that you can consider any mitigating circumstances which you may have discovered are in evidence in this case or can be based on any evidence that you have heard in either phase of this proceeding."
* * * * * *
 "All right. Now, when you go out I'll have these delivered to you. And you can take them with you and you can consider them. And probably — I can read seven of these and I know it took me years to know what they all — how many there were or what they said, so I don't think it's going to harm you all any to have this list. But most importantly, don't forget that this list is not exclusive, it's not — you are not restricted to this list. You can find any mitigating circumstances of any type or kind based on what you have heard this past five days."
The trial judge instructed the jury that they were to weigh the aggravating and mitigating circumstances and determine "whether the aggravating circumstances outweigh the mitigating circumstances or the mitigating circumstances outweigh the aggravating circumstances." He explained the function of the mitigating circumstances in the sentencing deliberations and informed the jurors that a finding of aggravating circumstances did not require them to return a death sentence.
 "If you should unanimously find beyond a reasonable doubt and to a moral certainty that the aggravating circumstance does exist, then you must proceed to balance the aggravating circumstance against the mitigating circumstance or circumstances. And based on this process you determine punishment, whether the punishment should be death or whether it should be life imprisonment *Page 1175 
without parole. This balancing, this weighing, of the mitigating and the aggravating circumstances is not a mechanical thing. It's not adding up numbers and say I've got more on this side than I've got on that side. Not at all. You don't add the numbers. The law recognizes that one on one side might outweigh four on the other side. Or four on the other side might outweigh one or ten on the other side. What I'm trying to tell you is that just because there may be more aggravating circumstances or more mitigating circumstances than aggravating doesn't mean that the numbers mean. It means what you, as jurors, think. What weighs the most? What you, as jurors, consider to be the most important, namely, whether it be aggravating or whether it be mitigating."
Here, as in Tucker, the judge's oral charge contained "adequate guidelines to lead a reasonable juror to fully comprehend the duties and choices involved in the sentencing procedure." Cornv. Zant, 708 F.2d 549, 562 (11th Cir. 1983).
Cochran's argument that the judge should have pointed out the specific mitigating factors the jury might have found applicable to him, such as his good character and employment record, was also answered in Tucker.
 "But Tucker argues further that the trial court should have pointed out the specific mitigating factors, such as age and lack of prior criminal record, that the jury might have found applicable to him. Nothing in any of our cases suggests that such explicit enumeration of possible mitigating factors is required. On the contrary, Spivey's indication that a judge must 'tell the jury what a mitigating circumstance is and what its function is', 661 F.2d at 471, contemplates a more general explanation. Moreover, a requirement that the trial court list specific mitigating factors would be inharmonious with the Supreme Court's admonitions that the sentencer be free to consider any relevant mitigating factor. See Eddings v. Oklahoma, 455 U.S. 104, 110-12, 102 S.Ct. 869, 873-875, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 602-05, 98 S.Ct. 2954, 2963-65, 57 L.Ed.2d 973 (1978). The sort of specificity Tucker requests would doubtless bring complaints from other petitioners that the trial court had unduly narrowed the focus of the jury's consideration. Defendant's counsel is, of course, free to direct the jury's attention to specific mitigating circumstances, but the Constitution does not oblige the trial court to do so." Tucker, 724 F.2d at 892.
See also Smith v. State, 249 Ga. 228, 290 S.E.2d 43, cert. denied, 459 U.S. 882, 103 S.Ct. 182, 74 L.Ed.2d 148 (1982);Godfrey v. State, 248 Ga. 616, 284 S.E.2d 422 (1981), cert. denied, 456 U.S. 919, 102 S.Ct. 1778, 72 L.Ed.2d 180 (1982).
 VIII
Cochran contends that the trial judge erred at the sentencing phase in that he found no mitigating factors and "erroneously assumed that the absence of mitigating circumstances automatically dictates that the aggravating circumstances are sufficient to warrant the death penalty."
Cochran asserts that the evidence presented at the guilt and sentence phases of his trial establish three mitigating factors. (1) His employment history shows that he was "never disciplined in any way for any violent acts or for being intoxicated on the job." (2) The fact that he attempted to stop the store manager from following him, that it was "not a particularly cruel or heinous killing, and there was no effort to harm any witness." (3) The third mitigating factor is that there was no direct evidence that Cochran actually killed the store manager.
With regard to the aggravating and mitigating circumstances, the written order of the trial judge is as follows:
 "The Court finds as a matter of fact that as shown by State's Exhibits One and Two from the punishment hearing that defendant was previously convicted of a felony involving the use or threat of violence to the person of another, that being *Page 1176 
two such felonies as shown above, 13-11-6 Subs. 2.
 "The Court further finds that there are no mitigating circumstances shown. Therefore, the aggravating circumstances as required by law totally outweigh mitigating circumstances, there being none shown."
Cochran's contention was answered by our supreme court inEx parte Dobard, 435 So.2d 1351, 1358 (Ala. 1983):
 "Petitioner insists that the trial judge and jury failed to consider nonstatutory mitigating circumstances in rendering a sentence of death. In support of this contention petitioner offers the sentencing order of the trial court, which fails to mention any nonstatutory mitigating circumstances. The judge and jury should consider both statutory and nonstatutory mitigating circumstances. Beck v. State, 396 So.2d at 663. This should include all relevant evidence that indicates 'not only why a death sentence should be imposed, but also why it should not be imposed.' Id., at 662. A review of the sentence hearing reveals the following instruction of the court to the jury:
 "'So those are the mitigating circumstances that the law of Alabama provides. In addition to mitigating circumstances that I just read to you, you may also consider as a mitigating circumstance any aspect of the defendant's character, his life, and any of the circumstances of the capital offense which tend to indicate that the defendant should not be sentenced to death. Mitigating circumstance does not have to be included on the list that I have read to you in order for you to consider it. Mitigating circumstances considered by you should be based on the evidence that you have heard. And if you are satisfied from the evidence presented during the guilt stage of the trial or during the sentencing hearing, that a mitigating circumstance exists in this case then you should consider it. Mitigating circumstance need not be proven to you — need merely be proven to your satisfaction. It does not have to be proven beyond a reasonable doubt for you to consider it. Only an aggravating circumstance has to be proven beyond a reasonable doubt and that burden is on the State.'
 "The fact that nonstatutory mitigating circumstances were not listed in the sentencing report is by no means conclusive that they were not considered. In light of the instructions given to the jury, it is clear that they were in fact considered." (Emphasis added.)
Here, we also find that in light of the instructions given to the jury, it is clear that the nonstatutory mitigating circumstances were considered. See also Barfield v. Harris,540 F. Supp. 451, 472 (E.D. N.C. 1982), affirmed on other grounds,719 F.2d 58 (4th Cir. 1983) (Death sentence not rendered invalid by trial court's failure to elaborate various plausible nonstatutory mitigating circumstances, where the jury was not precluded from considering same.).
It is not required that evidence submitted by the accused as a nonstatutory mitigating circumstance be weighed as a mitigating circumstance by the trial judge. Mikenas v. State,407 So.2d 892, 893 (Fla. 1981), cert. denied, 456 U.S. 1011,102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982).
 "Although consideration of all mitigating circumstances is required by the United States Constitution, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the decision of whether a particular mitigating circumstance in sentencing is proven and the weight to be given it rest with the judge and jury. Lucas v. State, 376 So.2d 1149 (Fla. 1979)." Smith v. State, 407 So.2d 894, 901 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982).
"The fact that the sentencing order does not refer to the specific types of non-statutory 'mitigating' evidence petitioner introduced indicates only the trial court's finding the evidence was not mitigating, not that such evidence was not considered. . . . What one person may view as mitigating, another may not." Dobbert v. Strickland, *Page 1177 718 F.2d 1518, 1524 (11th Cir. 1983). "The sentencing authority possesses unbridled discretion to consider any perceived mitigating circumstances. . . . The sentencing authority can assign what it deems the appropriate weight to particular mitigating circumstances. Moreover, with unbridled consideration of mitigating circumstances the sentencing authority may consider something to be mitigating that others might consider aggravating." Moore v. Balkcom, 716 F.2d 1511,1521-22 (11th Cir. 1983).
The fact that Cochran made no effort to harm witnesses or bystanders does not necessarily constitute a mitigating circumstance in this particular case, see Dobbert v.Strickland, 718 F.2d at 1524, even though it was so considered under the circumstances presented in Evans v. State,361 So.2d 654, 664 (Ala.Crim.App. 1977), affirmed on other grounds,361 So.2d 666 (Ala. 1978), cert. denied, 440 U.S. 930,99 S.Ct. 1267, 59 L.Ed.2d 486 (1979) (The trial judge found as a nonstatutory mitigating circumstance "the fact that Mr. Evans made no effort or attempt to harm the two young daughters of Edward A. Nasser, deceased, who were in his immediate presence at the time of the commission of the Capital Felony or any of the other witnesses in the vicinity."). In Hopper v. Evans,456 U.S. 605, 613, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982), the United States Supreme Court characterized a murderer's proclamation "that, although he will try not to kill his victims, he will do it if he finds it to be an occupational necessity" as "an extraordinary perversion of the law." Here, in distinction to Evans, there were no eyewitnesses to the actual shooting.
It is true as Cochran argues that in Neal v. State,372 So.2d 1331, 1346 (Ala.Cr.App.), cert. denied, 372 So.2d 1348 (Ala. 1979), the trial judge did find that "(w)hile there was sufficient evidence for the jury to find Eddie Bernard Neal guilty, there was not the depth of evidence against him which this court must insist upon for the penalty of death to be invoked."
Here, there is no "lack of depth" of evidence involved, even though there was no direct eyewitness testimony to the murder. Cochran was identified as the robber. He was observed leaving the grocery store armed with a pistol. He was being pursued by the assistant store manager. Within a short period of time a shot or shots were heard, Cochran was arrested and the body of the manager was found. Circumstantial evidence is in nowise considered inferior evidence and is entitled to the same weight as direct evidence provided it points to the guilt of the accused. Capps v. State, 424 So.2d 681, 683 (Ala.Cr.App. 1982);Davis v. State, 418 So.2d 959, 960 (Ala.Cr.App. 1982).
Cochran argues that the trial judge improperly assumed that the death penalty would automatically be imposed if he found one aggravating circumstance and no mitigating circumstance. After finding the existence of one aggravating circumstance, the trial judge stated in his sentencing order:
 "This Court further finds that there are no mitigating circumstances shown. Therefore, the aggravating circumstances as required by law totally outweigh the mitigating circumstances, there being none shown.
 "After considering all matters properly before the Court as herein stated and presented during this hearing, this Court is convinced beyond a reasonable doubt and to a moral certainty that the aggravating circumstance is sufficient to uphold the jury's fixing the punishment of death and this Court so finds as a matter of fact."
We interpret this portion of the court's written findings to mean that the trial judge initially determined that the aggravating circumstances outweighed the mitigating circumstances because he found no mitigating circumstances andthen he determined that the particular aggravating circumstance found was sufficient to warrant the death penalty. We do not interpret his order to mean that he found the aggravating circumstance sufficient because *Page 1178 
there were no mitigating circumstances. The Alabama Supreme Court's decision in Beck does not establish a "presumptive sentence". Unlike Florida's, our statutory sentencing scheme does not provide, that if even one aggravating circumstance if found, "death is presumed to be the proper sentence" unless overcome by sufficient mitigating circumstances. State v.Dixon, 283 So.2d 1, 9 (Fla. 1973), cert. denied, 416 U.S. 943,94 S.Ct. 1950, 40 L.Ed.2d 295 (1974).
 "The 1975 Act provides that if the sentence is death, the trial judge shall set forth in writing one or more aggravating circumstances 'which it finds sufficient to support the sentence of death.'
Ala. Code § 13A-5-33(1) (Supp. 1978) (repealed 1981) (emphasis added). In other words, the mere presence of an aggravating circumstance, apparently even in absence of a mitigating circumstance, does not automatically dictate a death sentence. The aggravating circumstance must be found sufficient to support the death penalty." J. Colquitt, The Death Penalty Laws of Alabama, 33 Ala.L.Rev. 213, 318 n. 713.
This Court has searched the record for error as required by Alabama Code § 12-22-240 (1975) and A.R.A.P. 45A, and found no error which "has or probably has adversely affected the substantial right of the appellant." A.R.A.P. 45A.
The procedures established by Beck require proportionality review in death cases governed by the 1975 Act. The 1981 Act specifically provides for proportionality review. Alabama Code § 13A-5-53 (Supp. 1981).
As required by Beck v. State, 396 So.2d 645 (Ala. 1980), we make the following findings: (1) The crime was in fact one punishable by death. Cochran was indicted and convicted for violating Alabama Code § 13A-5-31(a)(2) (1975) (formerly § 13-11-2(a)(2) ("Robbery or attempts thereof when the victim is intentionally killed by the defendant") which is by statutory definition and designation a capital offense.
Similar crimes are being punished capitally throughout this state. In Beck, our Supreme Court noted that, of the 50 cases it studied, 33, or 66%, were robbery-intentional killing cases. 396 So.2d at 654 n. 5.
(3) We also find that the sentence of death is appropriate in relation to James Willie Cochran. While this particular offense is not as heinous and atrocious as many of those we have reviewed, the fact that Cochran deliberately killed an unarmed man in order to effectuate his escape after the commission of a robbery, when coupled with the facts that Cochran pled guilty to second degree murder in 1961 and was convicted of robbery in 1976, dictates a sentence of death.
In reviewing Cochran's sentence, we also apply Alabama Code § 13A-5-53 (1975). (1) There is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor. (2) Our independent weighing of the aggravating and mitigating circumstances supports the findings of the trial judge and indicates that death is the proper sentence. (3) Considering both the crime and the individual, we determine that death is neither excessive nor disproportionate to the penalty imposed in similar cases.
In our search of the record in both the guilt and sentence phases of Cochran's trial, we have found no error. That search convinces us that the judgment of the circuit court is due to be affirmed.
AFFIRMED.
All Judges concur. *Page 1179